Per Richardson, J.
dissenting.—By the Act of’85, all releases of lands must be recorded in six months. But the want of recording does not injure the title, i. e., as between the donor and donee. The Act of ’95, makes no alteration in such recording, but expressly requires renunciations of dower, &c., to be recorded, of course in six months. But in the 3d clause, it is enacted, that renunciations of the wife’s inheritance shall “not be complete or legal until recorded.” Under this Ihird clause it was decided, by the late Court of Appeals, that the recording of such renunciations, by a feme covert, must be in *580 virtue of the Act of ’85,—of course in six months. And unless so recorded in six months, then in virtue of the Act of ’95, it is incomplete and illegal, in its original execution, by the plain letter of that act.
Shall that decision be reversed, is now the question'?
I dissent from the decision of the Court, because it sets aside the judgment of the late Court of Appeals, in the case of Hillegas v. Hartley, Hill R. 106, upon argument inadequate to justify such a reversal. That judgment is direct and conclusive of the question of the present case, and of course, the opposite decision in this case directly and conclusively reverses the judgment in the former, and introduces an entire new exposition, not only in the meaning of the terms of the Act of ’95, but in its spirit and general object, reconverts an Act, for the condition precedent to the wife’s binding renunciation, into a mere registration, as if recording had not already belonged to all conveyances of land. My objections, therefore are, twofold. First, as to the letter of the Act. After the terms of an Act have been settled for fourteen years, it is inconvenient and inconsistent, if not dangerous, to give a nc tv version. On this head I would observe, that although the enactment—‘"that the renunciation shall not be complete or legal until recorded,” <&c., might perhaps admit of different interpretations, yet they will admit of this meaning,—that unless recorded as other Mesne Conveyances, i. e., within six months, the renunciation of a married woman is incomplete and illegal. This is what had been decided. The object is her protection, and it would be a further protection to her inheritance, that it should be so recorded, or be void—i. e., not binding even between the parties; whereas other conveyances bind the immediate parties, though not recorded in clue time—or never put on record. This difference would seem to be the further protection intended for the wife’s inheritance by the Act. Secondly. In expounding such an Act, it should be borne in mind, that all such Acts, by affording the means of a married woman renouncing her inheritance, alters the common law, and practically ministers to her deprivation, by giving her any such power, while yet under the influence of her husband. A wife *581 is not sui juris. Such Acts, therefore, by removing her legal disabilities, which constitutes, says Blackstone, “her protection,’’ really infract her rights; and therefore the Act, when equivocal, should be made to enure to her best possible protection. The Act is far from being a mere remedial Act, to be expounded liberally, to advance and facilitate the sale of her inheritance. Is it an Act in derogation of the common law protection of the voile’s landed estate, which holds her incapable, for her own security, of releasing it during coverture? Thence it follows that the Act of 1795 is to be expounded strictly, when opposed to the wife’s interest, and liberally, if necessary, to preserve her lands—i. e., every condition must be fulfilled, or she retains her inheritance. This object, and such characteristic of the Act, I take to be the key to the construction made by the late Court of Appeals, now to be set aside. That decision secs, in the terms of the Act, its true spirit; and whatever might have been its construction, I perceive no sufficient reason for reversing that of the Court of Appeals, so made, upon a just and comprehensivo conception of the Act, in connexion with the principles of the common law. Her protection is the element of the past construction. Shall it now bo reversed? Here, let it be remarked, that this makes the third instance in which the decisions of the hate Court of Appeals have been reversed; State v. M’Bryde, Fash v. Ross, and the present case. I deem it, therefore, a fit occasion, and proper case, to express my opinion of the importance of the maxim, stare decisis. The reversal of a former decision introduces this striking inconsistency—that the party, or side, who gained the case before, loses it upon the reversal.
In Hillegas v. Hartley, the wife regained her inheritance from the omission to record in six months; in the present case she loses it by the reversal oí'the former case. This inconsistency shocks the minds of men, and the Court is lessened in their respect and confidence, and loses the character of its high conservative usefulness. It is in its unlcgislativc uniformity that the judiciary has its force oí character, its strength and its usefulness. It is vested with great discretion and power, but is essentially unlcgislativc. And it is better to have ordi *582 nary laws stable, when once understood, than better laws, subject to unlooked-for changes. “Misera est servitas, ubi jus est vagum aut incondilurn,” is an historical fact; and the shield against the introduction of this great evil is placed, by the constitution, in the hands of the judiciary. Upon such practical justice, sound sense, and judicial reliance, the rule of Judges adhering to established expositions of law, is bottomed. Firmness in such a course, is but little less essential, and very analogous to the rule, that a case at law being once fairly tried, the judgment rendered closes up every question, submitted in the issue made between the .same parties. For when such judgment has been sanctioned by the Appeal Court, it gives solemn assurance that all future litigants shall receive the same judgment on presenting the like case. I grant that such reversals come within judicial authority, but they should depend upon a comparison with former adjudications, in connexion with considerations of justice, prudence, and judicial consistency, and ought not to be sanctioned, but in cases of a manifest former error. In a word, I am not convinced of either the force of argument, or of the necessity of this reversal of the former decision. That decision, and the present reversal, stand in these respects, to say the least, too well balanced for the judicial introduction of such a change; which I consider not merely alterative of terms, but introductivo of a different end and principle for the Act of'95. But further, the fact that, the present decision lays down no intelligible rule of its own, while it destroys the former rule, that the wife’s renunciation must be recorded in six months. This leaves the Act of ’95 in a state of vacillation with every new case. In M’Bryde’s case, the constitutional jurisdiction of the Court was laid down; and in Fash v. Ross, there is at least a rule for other cases, substituted for the former; but in the present reversal, I can perceive no rule, unless it bo meant that the bare renunciation transfers the wife’s inheritance—i. e., it stands like other conveyances— valid as between the original parties, recorded or not. This would be intelligible, I grant, but then, away goes the provision in her favor. The renunciation “shall not be legal or complete until recorded,” which I consider important protection, and *583 intended to give early notice to her iriends, in case the wife should have been secretly coerced, and require some interposition of a Court. The early recording, and consequent notoriety, is, in fact, a great safe-guard for the wife, against the grasping of her husband; and also keeps up something like the protection she before had, in the public judicial proceeding by fine and recovery—for which the Acts of 1731, and ’95, are the substitutes.
I am, therefore, for adhering to the former decision, because I can see nothing better in the present, and because the reversa^ in its effect, appears, to my understanding, to interpolate a new principle, that trenches manifestly upon the common law protection of femes coverts; and this would amount to a legislative enactment, rather than a judicial interpretation of the Act of 1795.
O’Neall J. was absent, holding the Circuit Court in Charleston.